**Signed: September 08, 2006**



_____
**LESLIE TCHAIKOVSKY**
**U.S. Bankruptcy Judge**
_____

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

In re                                                            No. 05-48495
                                                                 Chapter 13
JOHNATHAN OCERA CORTEZ and
AURORA TOLENTINO CORTEZ,

    Debtors
_____/

**MEMORANDUM OF DECISION RE
MOTION TO DISMISS CASE WITH PREJUDICE**

    On May 26, 2006, debtors Johnathan and Aurora Cortez ("Debtors") moved to dismiss the above-captioned chapter 13 case.[1] At that time, creditor Cedar Associates ("Cedar") filed a response in which it urged the Court to dismiss the case with prejudice. In order to give the Debtors an adequate opportunity to respond to Cedar's request, the Court granted the Debtors' motion to dismiss on May 31, 2006, but retained jurisdiction to consider a motion

---

[1] All title, chapter, and section references are to title 11 of the United States Code unless otherwise indicated.

filed by Cedar or the chapter 13 trustee ("Trustee") within thirty days, requesting that the dismissal be made with prejudice.

The Trustee subsequently made a timely motion to dismiss the case with prejudice, and Cedar joined in the motion. Having considered the papers and arguments submitted, the motion to dismiss the case with prejudice is granted.

**BACKGROUND**

Prior to October 15, 2004, Debtors owned their residence located at 3254 Ursa Way in Hayward, California (the "Residence") as joint tenants. On October 15, 2004, Debtors executed a grant deed, which transferred a joint tenancy interest in the Residence to their son Eric Cortez ("Eric"), in order to qualify for refinancing.

In November of 2004, Mr. Cortez transferred his interest in the Residence to Eric. Debtors testified that the second transfer was made for "estate planning" purposes because Mr. Cortez was in bad health and wanted to ensure that Eric eventually received the Residence. Debtors also testified that they understood that, under a joint tenancy, the Residence would pass to the surviving joint tenants.

In December of 2004, a refinancing agreement was entered into with Countrywide Home Loans ("Countrywide"). Although the promissory note has never been produced, both Eric and Mrs. Cortez were named as borrowers on an Alliance Title closing statement, and

2

they both signed, as borrowers, documents giving Countrywide first and second deeds of trust on the Residence.

The proceeds of the refinance amounted to $138,000. A check for that amount was issued in Eric's name only. Eric opened a checking account in his name at Technology Credit Union (the "Technology Account"), into which he deposited the check. Debtors testified that they did not put the check into their own account in part because the check was in Eric's name and in part to avoid the levies of their creditors.

Nevertheless, Eric testified that he considered the funds in the Technology Account to belong to the Debtors. Mrs. Cortez maintained possession of the Technology Account's check register in which she made all of the entries;[2] she wrote the checks on the Technology Account and presented them to Eric for his signature.

The money in the Technology Account was used to pay the Debtors' bills, including the mortgage payments, property taxes, and a judgment awarded against the Debtors. Debtors loaned about $60,000 to Compleat Visions Unlimited, Inc. ("Compleat"), the business owned and operated by the Debtors. Additionally, the Debtors spent approximately $43,000 to remodel the kitchen of the Residence. The remodeling began in July of 2005 and was completed pre-petition. On the petition date, $20,136 remained in the

---

[2] Evidence was presented at trial that, after the meeting of creditors, counsel for Cedar wrote to Debtors' counsel, asking if they maintained a check register for the Technology Account. Debtors' counsel responded that they did not.

3

Technology Account.  However, Mrs. Cortez wrote at least one check to a contractor and one check to an appliance store post-petition to pay for the pre-petition remodeling.

On August 1, 2005, Compleat filed a chapter 11 petition. Debtors filed a chapter 13 petition on October 14, 2005.  In the petition, they indicated that neither they nor any affiliates had a previous or pending bankruptcy case.

On October 31, 2005, Debtors filed Schedules A through J.  In their schedule of real property, Debtors listed a fee interest in the Residence.[3]  They valued this interest at $113,000, and did not list any encumbrances against the property.  In their schedule of personal property, Debtors listed two accounts at Bank of the West, one account at East Bay Postal Credit, two IRA accounts, two vehicles, household goods and furnishings, and clothing.  Debtors scheduled two secured creditors (each with a security interest in Debtors' vehicles), no priority creditors, and a number of unsecured creditors (including Cedar).[4]  Debtors did not list any co-debtors on Schedule H.  Finally, Debtors' schedule of income indicated that Mr. Cortez received disability income in the amount of $1,505 per month, and Mrs. Cortez received $1,800 per month from her wages as a bookkeeper for Compleat.  Their expense schedule,

---

[3] Debtors also claimed a homestead exemption in the Residence under Cal. Civ. Proc. Code § 704.730(a)(3) in the amount of $113,000.  On March 3, 2006, Debtors amended schedule C to increase the amount of the claimed homestead exemption to $131,000.

[4] Debtors amended Schedule F to add several unsecured creditors on December 12, 2005.

4

which did not include mortgage payments, taxes, or insurance, listed $2,242 in expenses, leaving excess income of $1,063.

Along with their schedules, Debtors filed a Statement of Financial Affairs; however, sections nineteen through twenty-five were missing. In the section titled "Nature, location and name of business," Debtors indicated that they operated and received wages from Compleat. In the section titled "Other Transfers," Debtors indicated that they had transferred one half of their interest in the Residence to their son Eric Cortez ("Eric") on December 1, 2004, for no value.

Also on October 31, 2005 Debtors proposed a plan, pursuant to which they would make forty-two monthly payments in the amount of $1,050, paying 10% on unsecured claims.[5] Mr. Cortez filed a declaration in support of this plan. He explained that the Residence had been refinanced in December of 2004, and the Debtors received proceeds in the amount of $125,000, which they used to pay medical bills and general creditors and funded Compleat.[6] Mr. Cortez stated neither his nor Mrs. Cortez's name was on the mortgage – the new first and second deeds of trust were in Eric's name only. Eric made the mortgage payments in lieu of paying rent. Mr. Cortez expressly stated that the Debtors considered all of the equity in the property to be theirs.

---

[5] Debtors amended their plan three times, eventually providing for a sixty-month plan paying unsecured creditors pro tanto.
[6] Debtors subsequently testified that none of the funds in the Technology Account were used to pay medical bills.

5

In December of 2005, Mr. Cortez's mother gave Debtors a check for $25,000 as a gift. Mrs. Cortez deposited this sum into the Technology Account.

The Debtors attended the initial meeting of creditors on December 29, 2005. Debtors did not volunteer any information regarding the Residence or the refinance at the meeting. They did, however, respond to questions from Cedar's counsel. The Trustee learned of the refinance for the first time at this meeting.

Debtors subsequently amended their schedules. On March 3, 2006, they amended schedule A to list themselves as co-owners of the Residence, to increase the value from $113,000 to $650,000, and to include an encumbrance in the amount of $519,000. On April 12, 2006, Debtors amended schedule B to include the Technology Account with a balance of $20,136. They amended schedule D to include Countrywide as a secured creditor. They also amended schedule I to provide that Mrs. Cortez received net wages of $1,000 per month as bookkeeper for an accountant named Raymond Young and that Mr. Cortez received a contribution of $800 per month from his mother.

The Trustee and Cedar objected to confirmation of the plan on grounds of bad faith and feasibility. They requested that the case be converted to chapter 13.[7] The Court conducted an evidentiary hearing on the issue of bad faith at which the Debtors and Eric testified.

---

[7] VW Credit, Inc. objected to confirmation on other grounds but later withdrew its objection. Cedar also objected to Debtors' claimed homestead objection.

6

Based on the evidence presented, the Court concluded that Debtors had acted in bad faith, and consequently, cause existed under section 1307(c) to convert the case to chapter 7. However, before converting the case, the Court gave the Debtors seven days to request that the case be dismissed.

As noted above, Debtors moved to dismiss the case. Cedar filed a "response" in which it requested that the dismissal be granted with prejudice. The Court granted the dismissal but gave the Trustee and Cedar thirty days to file a motion to order the dismissal with prejudice. The Trustee filed such a motion, and Cedar joined in the motion. A hearing was held on August 18, 2006, and the Court took the matter under submission.

**DISCUSSION**

The dismissal of bankruptcy cases with and without prejudice is authorized by section 349(a). Leavitt v. Soto (In re Leavitt), 171 F.3d 1219, 1223 (9th Cir. 1999). Section 349 provides:

> Unless the court, for cause, orders otherwise, the dismissal of a case under this title does not bar the discharge, in a later case under this title, of debts that were dischargeable in the case dismissed; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(g) of this title.

11 U.S.C. § 349(a). Consequently, unless a court orders otherwise, dismissals are ordered without prejudice. Id.; Leavitt, 171 F.3d at 1223.

"A dismissal with prejudice bars further bankruptcy proceedings between the parties and is a complete adjudication of

7

the issues." <u>Leavitt</u>, 171 F.3d at 1223-24. "Cause" for dismissal with prejudice under section 349(a) is not defined by the Bankruptcy Code. <u>Id.</u> at 1224. In <u>Leavitt</u>, the Ninth Circuit held that "bad faith is 'cause' for a dismissal of a Chapter 13 case with prejudice under § 349(a) and § 1307(c)." <u>Id.</u> The court reasoned that, under section 1307(c), bad faith is "cause" for dismissal. <u>Id.</u> (citing <u>In re Eisen</u>, 14 F.2d 469, 470 (9th Cir. 1994)). "Therefore, it follows that a finding of bad faith based on egregious behavior can justify dismissal with prejudice." <u>Id.</u>

Determining whether bad faith exists "involves the application of the 'totality of the circumstances' test." <u>Id.</u> A bankruptcy court should consider the following factors:

1. Whether the debtor misrepresented facts in his petition or plan, unfairly manipulated the Bankruptcy Code, or otherwise filed his chapter 13 petition or plan in an inequitable manner.

2. The debtor's history of filings and dismissals.

3. Whether the debtor only intended to defeat state court litigation.

4. Whether egregious behavior is present.

<u>Id.</u> A finding of bad faith does not require fraudulent intent, malice, or malfeasance on the part of the debtor. <u>Id.</u> at 1224-25.

In <u>Leavitt</u>, the first factor was satisfied when the debtor failed to fully disclose his assets and financial dealings; undervalued some assets; inflated his expenses; offered nothing to the largest unsecured creditor in his first plan; ignored the bankruptcy court's order to amend the plan to include at least a

8

thirty percent payment to creditors; and failed to disclose the receipt of $36,000 and his purchase of a new home during the case. Id. at 1225. With respect to the second factor, the debtor had filed two bankruptcy cases in six years, and he went on to file three more with the goal of avoiding the judgment of his largest unsecured creditor. Id. This motive and the timing of the debtor's first filing – within two weeks of a judgment being issued against him – satisfied the third factor. Id. Finally, the court concluded that the debtor's behavior was egregious because he offered no excuse for his actions, and his clear intention was to use bankruptcy to avoid payment of the judgment. Id. at 1226.

The Ninth Circuit also noted that less offensive conduct had constituted grounds for dismissal with prejudice. For example, in In re Morimoto, 171 B.R. 87 (9th Cir. BAP 1994), the debtor, a tax protestor, filed her petition with the intent of avoiding payment of federal income taxes. In In re Hopkins, 201 B.R. 993, 995 (D. Nev. 1996), the debtors failed to file proper income tax returns, and indicated zero taxable income despite W-2 forms showing substantial wages earned. In In re Tomlin, 105 F.3d 933 (4th Cir. 1997), the debtor failed to attend the initial creditors' meeting or to timely file schedules. The Ninth Circuit expressly noted these cases would have all been properly dismissed under the Leavitt standard. Leavitt, 171 F.3d at 1226.

Here, the Court has previously determined that the Debtors acted in bad faith. Application of the <u>Leavitt</u> factors reinforces this conclusion.

The Debtors have made numerous misrepresentations in their petition, plan, and schedules. First, in their petition, the Debtors indicated that none of their affiliates were involved in a pending bankruptcy. However, Compleat had filed a chapter 11 petition on August 1, 2005, and that case was still pending as of the date the Debtors filed their petition, October 14, 2005.

In their original schedule of real property, Debtors listed themselves as the fee owners of the Residence, which they valued at $113,000 and they listed no encumbrances. However, after Cedar and the Trustee objected to plan confirmation, the Debtors amended schedule A to indicate that Mrs. Cortez co-owned the Residence with Eric; the value of the Residence was at least $650,000; and the Residence was encumbered to the extent of $519,000. Thereafter, contrary to these amendments, Mr. Cortez indicated in his declaration accompanying the Debtors' original chapter 13 plan, he and his wife considered all of the equity in the Residence to be theirs.

Debtors did not reveal their interest in the Technology Account in their schedule of personal property. Although it was in Eric's name, Eric testified that he considered the money in the Technology Account to belong to the Debtors. The funds in the Technology Account were used solely to pay Debtors' bills. Mrs.

Cortez appears to have exercised sole control over the Technology Account, its checks, and its check register. Further, although Debtors maintained possession of the check register, their counsel told counsel for Cedar that they did not.

Debtors did not reveal their ownership of any stock in either their schedule of personal property or Statement of Financial Affairs. However, Debtors own 100 percent of the stock of Compleat.

Debtors did not originally schedule Countrywide as a secured creditor. Although Debtors claimed they were not obligated on the debt to Countrywide, evidence has been introduced to the contrary. Both Mrs. Cortez and Eric were listed as the borrowers on the Alliance Title closing statement and both signed the documents granting Countrywide deeds of trust. Debtors did not produce the promissory note to support their contention nor did they explain their failure to do so.

Debtors did not schedule any priority claims. Specifically, while the Debtors acknowledged liability as guarantors for Compleat's debt - including its taxes - Debtors did not schedule any taxes owed. However, the Internal Revenue Service subsequently filed a priority claim for taxes in the amount of $58,000.

Debtors did not list any co-debtors in schedule H. As noted above, however, the Court believes that both Eric and Mrs. Cortez are obligated on the mortgage to Countrywide.

Debtors' original schedule of income did not accurately reflect their sources of income. Although they first indicated that Mrs. Cortez was receiving net wages of $1,800 per month from Compleat, she later revealed that she was actually receiving net wages of $1,000 per month from another employer. Additionally, Debtors later indicated that they received monthly contributions in the amount of $800 from Mr. Cortez's mother. Debtors also received $300 each month from Eric, but never included this amount in their schedules.

In their schedule of expenses, Debtors did not list any mortgage payments. Debtors contended that Eric made the mortgage payments in lieu of paying rent. However, Debtors and Eric subsequently testified that Eric did not use his own funds to pay the mortgage.[8] Rather, Mrs. Cortez prepared checks from the Technology Account for Eric's signature to make the monthly mortgage payments. Tellingly, Mrs. Cortez appeared to be extremely familiar with the amounts of and recent changes to the mortgage payments while Eric was completely unfamiliar with these issues.

Debtors' Statement of Financial Affairs is incomplete. However, in the portion they provided, Debtors indicated that the only payments aggregating more than $600 that they had made to creditors within the ninety days prior to the petition date were to American Honda Finance and Volkswagen Credit. However, Debtors had

---

[8] Debtors and Eric testified that he contributes $300 per month from his own funds for household expenses.

paid over $30,000 to Countrywide and for remodeling the kitchen of the Residence during the ninety-day period.

Also in their Statement of Financial Affairs, Debtors indicated that they had only made one transfer of property within one year of the petition date: i.e., a one-half interest in the Residence to Eric. This was both inaccurate and incomplete. The first transfer to Eric was of a joint tenancy interest: i.e., after this transfer Eric, Mr. Cortez, and Mrs. Cortez each owned an undivided one-third interest in the Residence. The second transfer to Eric occurred when Mr. Cortez transferred his interest in the Residence to Eric. The result of this transfer was that, nominally, at least, Eric owned a two-thirds interest in the Residence and Mrs. Cortez owned a one-third interest.[9] Finally, pursuant to the refinancing agreement with Countrywide, Mrs. Cortez and Eric transferred a first and second deed of trust in the Residence to Countrywide.

Debtors failed to disclose the receipt of $25,000 as a gift from Mr. Cortez's mother in December 2005. This money was deposited into the Technology Account.

---

[9] Debtors may not have been entirely forthcoming about their purpose in executing the second transfer. They stated it was done for estate planning purposes. However, the Debtors and Eric held the Residence as joint tenants. The Debtors testified that they realized that a deceased joint tenant's interest would pass to the surviving joint tenants. Eric is the natural son of both Debtors. Debtors offered no explanation as to why the transfer was actually necessary to further their stated goal of estate planning.

13

Debtors also dealt unfairly or inequitably with their Creditors. First, Debtors paid at least $38,000 post-petition to selected creditors for work performed pre-petition. Second, Debtors omitted at least two major creditors from their original schedules – Countrywide and the IRS. Finally, as noted above, Debtors indicated that one reason for putting the refinance proceeds into the Technology Account, which was in Eric's name only, was to avoid the reach of Debtors' creditors. Debtors subsequently omitted the Technology Account from their schedule of personal property. For these reasons, the first <u>Leavitt</u> factor appears to be satisfied: i.e., misrepresentations, manipulation, and/or inequitable conduct in connection with the bankruptcy case.

The second and third factors do not apply here as Debtors have not had any prior bankruptcy cases, and Debtors do not appear to have been motivated to commence the instant case solely to defeat a state court judgment. However, the Court believes that the Debtors' behavior is egregious enough to satisfy the fourth <u>Leavitt</u> factor. They made a number of material misrepresentations or omissions and paid substantial sums of money to selected pre-petition creditors post-petition without court approval.

Debtors also argue that the case should not be dismissed with prejudice because the second and third factors are not met. All four factors do not need to be satisfied, however. The Ninth Circuit was clear that the test for determining the existence of bad faith is a <u>totality of the circumstances</u> test. Further, not

all of the factors were satisfied in the cases cited as examples by the Ninth Circuit in <u>Leavitt</u>.

Debtors argue that the Debtors' acts were not as egregious as those of the debtor in <u>Leavitt</u>. There are in fact a number of similarities between case and <u>Leavitt</u>. In both cases, the debtors failed to fully disclose assets and financial dealings; undervalued some assets; omitted their largest creditors; and failed to disclose the receipt of a significant sum of money and the purchase or, here, the remodeling of a home during the case. Nevertheless, the Ninth Circuit noted in <u>Leavitt</u> that less offensive conduct had constituted sufficient grounds for dismissal with prejudice. In the Court's view, this case lies somewhere between <u>Leavitt</u> and the cases cited therein.

**CONCLUSION**

For the above reasons, the Court believes that the totality of the circumstances demonstrate that the Debtors have acted in bad faith. Consequently, Debtors case may and should be dismissed with prejudice. The motion of the Trustee and Cedar is granted.

Counsel for Trustee is directed to submit a proposed form of order in accordance with this decision.

END OF DOCUMENT

15

COURT SERVICE LIST

```
Martha Bronitsky
Chapter 13 Standing Trustee
24301 Southland Blvd., Ste. 200
Hayward, CA  94545-1541

Michael McQuaid
Carr, McClellan, Ingersoll, Thompson & Horn
216 Park Road
P.O. Box 513
Burlingame, CA 94011-0513

David Arietta
Law Offices of David Arietta
700 Ygnacio Valley Road, Ste. 200
Walnut Creek, CA  94596
```